# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>120 Manchester Lane, Mocksville, NC | ) ) ) ) ) ) | Case No. 1:15mj260 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

120 Manchester Lane, Mocksville, NC

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 286, 287, 317,<br>641,1028,1341, 1343, 1956 | Tax Fraud |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brian Grove, SA, IRS-CID
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/12/15 3:25pm.

_____
*Judge's signature*

City and state: Durham, NC

Joe L. Webster, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Brian Grove, being duly sworn, depose and state as follows:

1.    I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service (IRS-CID) and have been so employed since August 1991. My responsibilities as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Laws (26 U.S.C. § 7201 *et seq.*), the Foreign Bank Secrecy Act (31 U.S.C. § 5324 *et seq.*), the Money Laundering Control Act (18 U.S.C. §§ 1956 and 1957), as well as drug related offenses pursuant to 21 U.S.C. §§ 841 *et seq.*, as they relate to money laundering offenses.

## Professional Training and Experience of Affiant

2.    In 1991 and 1992, I attended 21 weeks of specialized training at the Federal Law Enforcement Training Center in Glynco, Georgia. This training focused on the various criminal violations investigated by IRS-CID Special Agents and included training on criminal statutes, constitutional law, investigative tools and techniques, and interviewing and debriefing of witnesses. In addition to this initial training, I have attended continuing professional education training from IRS-CID dealing with tax and money laundering investigations, the Bank Secrecy Act, civil and criminal forfeiture, and other federal violations. I continually read various publications, articles,

1

and training and reference materials that deal with both the
investigative and legal aspects of investigations of money
laundering, asset seizure and forfeiture, and narcotics.

3.   I have personally conducted or assisted in hundreds of
investigations of alleged criminal violations of the Internal
Revenue laws, Foreign Bank Secrecy Act, and the Money Laundering
Control Act.  These investigations focused on individuals who
derived their income from legal sources as well as illegal
sources.  As a result of these investigations, I have become
familiar with the methods and techniques used for the derivation
of funds through unlawful means, as well as the laundering and
concealment of illegally-obtained profits, and to use such
profits and assets traceable thereto for the promotion and
facilitation of unlawful activity.  I have extensive experience
analyzing various financial documents and bank records in an
effort to track the flow of money and assets.  I have conducted
or participated in the execution of over 300 search and seizure
warrants relating to investigations of violations of tax, money
laundering, and controlled substances offenses.  I personally
assisted in writing or was the affiant on many of the affidavits
written and used to obtain these search and seizure warrants.
My participation in these investigations has resulted in the
prosecution of numerous individuals as well as the seizure and

forfeiture of millions of dollars and assets derived from
illegal activity.

4. I know, based on my training and experience, that persons
engaged in fraud frequently retain records of their transactions
within their residence, place of business, rented storage units,
vehicles, or other places under their control. These records
may be in the form of written notes and correspondence,
receipts, negotiated instruments, contracts, bank statements,
and other records. Records of this kind are also often stored
on computer media.

5. There are many reasons why criminal offenders maintain
evidence for long periods of time. The evidence may be
innocuous at first glance (e.g. financial credit card and
banking documents, travel documents, receipts, documents
reflecting purchases of assets, personal calendars, telephone
and address directories, check books, videotapes and
photographs, utility records, ownership records, letters and
notes, tax returns and financial records, escrow files,
telephone and page bills, keys to safe deposit boxes, packaging
materials, computer hardware and software), but have
significance and relevance when considered in light of other
evidence. The criminal offender may no longer realize he/she
still possesses the evidence or may believe law enforcement
could not obtain a search warrant to seize the evidence. The

3

criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence, but which may be retrievable by a trained forensic computer specialist.

6. Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc. Records of such instruments are routinely maintained at the individual's residence or place of business.

7. Your affiant knows that individuals who are involved in ongoing criminal activities with other individuals and/or conspirators often communicate with each other by telephone, cell phone, two-way pagers, Blackberry communication devices, faxes, email, written correspondence, and voice messaging services. The contents of these communications often include dialogue regarding the illegal activities that participants are involved in. Many of these devices include communication history information, as well as a list of frequently contacted numbers or individuals. Records generated by these devices assist in documenting not only the subscriber information, but

4

also the fact that communications between known parties did, in fact, occur.

8. This affidavit is submitted in support of applications seeking search warrants for the following location and items, as described below, to be issued by the United States District Courts for the Middle Districts of North Carolina:

a. 120 Manchester Lane, Mocksville, North Carolina, and its curtilage and outbuildings, appurtenances, and attached and detached garages and vehicles and trailers located on such curtilage.

9. The facts set out in this affidavit will show there is probable cause to believe that Francisco Javier Castro-Reyes and others are involved in a scheme to defraud the United States by obtaining stolen and fictitious identities and preparing fraudulent federal tax returns requesting refunds in violation of Title 18, United States Code, Sections 286 (Conspiracy to Defraud the Government with Respect to Claims), 287 (False Fictitious or Fraudulent Claims), 371 (Conspiracy to Commit offense or to Defraud the United States), 641 (Theft of Public Funds), 1028 (Identity Theft), 1341 (Wire Fraud), 1343 (Mail Fraud) and/or 1956 (Money Laundering) for the period of January 1, 2012 through August 2015, and that evidence of these crimes and the disposition of fraudulently-obtained proceeds will be found at the premises listed above.

10. On August 11, 2015, Oscar Hernandez, Amado Valdez, Mayra Blair, Aurora Carvajal, Luis Carvajal, Bertha Del Pilar Vargas, Martin Ayala, Nery Irrael Grande Jimenez, and Francisco Javier Castro-Reyes ("Castro") were indicted by a federal grand jury in the Eastern District of Tennessee for criminal offenses including violations of Title 18, United States Code, Sections 286 (Conspiracy to Defraud the Government with Respect to Claims), 1349 (Conspiracy to Commit Wire and Mail Fraud), and 1956(h) (Conspiracy to Commit Money Laundering).

11. In April 2014, a Cooperating Witness (CW) was interviewed multiple times pertaining to his/her participation and knowledge of a fraudulent tax refund scheme operating in the Knoxville metropolitan area. The CW stated Amado Valdez and Oscar Hernandez run a multi-million dollar tax refund scheme in Knoxville. The CW met Valdez in 2012 and they shared an apartment together in Oak Ridge, Tennessee. In March 2014, the CW decided to remove himself/herself from the conspiracy. In an attempt to do so, the CW took a large box of Valdez's documents pertaining to this fraudulent tax refund scheme. These financial documents, which will be further discussed below, included U.S. Federal Individual Income Tax Returns, fake IRS Forms W-2, Individual Taxpayer Identification Numbers, fake identification cards, and Valdez's passport. In addition to the

6

documentary evidence discussed in this paragraph, the CW also took two of Valdez's cellphones. The CW turned over all of these items to law enforcement.

12. The CW stated that Valdez used to have a partner nicknamed "The Shark," an individual who was later identified as Oscar Hernandez. The CW stated Valdez and the Shark had a falling out because the Shark refused to pay Valdez. The CW knows that the Shark relocated to North Carolina, ran an identical scheme, and continued to use many of the same co-conspirators to perfect their schemes, including Carvajal for cashing checks, Julia LNU for preparing fraudulent W-2's, and Mayra Blair for preparing fraudulent tax returns.

13. The CW stated that shortly after he/she met Valdez, he/she began cashing fraudulent refund checks for Valdez. The CW also traveled with Valdez frequently and has met the other co-conspirators involved in the Valdez and Hernandez operation.

14. The CW explained that Valdez and Hernandez obtain fictitious U.S. Individual Taxpayer Identification Numbers ("ITINs") from the IRS. The IRS issues ITINs to help individuals, regardless of immigration status, comply with the U.S. tax laws, and to provide a means for efficiently processing and accounting for tax returns and refunds for those not eligible for Social Security Numbers (SSNs). Contained within the documents turned over by the CW were approximately four

7

hundred fifty (450) ITIN forms.

15. The CW informed law enforcement that once Valdez and
Hernandez had the ITINs, they provided them to "Julia" (whose
last name is not yet known), who resides in North Carolina, to
prepare fake IRS W-2 Forms. Julia charged Valdez and Hernandez
$300 for each phony W-2 Form. Valdez and Hernandez would take
the fake ITINs and W-2s to Mayra Moreno, a Knoxville area return
preparer, and had fraudulent U.S. Federal Individual Income Tax
Returns prepared. Contained within the documents turned over by
the CW were approximately eighty-nine (89) W-2 forms and
approximately eighty-two (82) U.S. Federal Individual Income Tax
Returns. Based on the CW's prior involvement in the conspiracy,
he/she knows that Julia prepared W-2s for Valdez and Hernandez
and that Julia and her husband ran a similar fraudulent tax
refund scheme in Charlotte, North Carolina.

16. The CW stated there are several return preparers in
Moreno's business who prepare the fraudulent returns. Moreno
charged $300 to prepare a fraudulent return but charges only $50
to $60 to prepare a legitimate return. Valdez and Hernandez
also supplied the return preparers with fake or stolen
identification for dependents and the addresses to be used on
the returns. The CW stated Valdez and Hernandez used several
addresses to receive the refund checks. The CW stated that it
is important that Valdez and Hernandez utilize the same

8

addresses numerous times to maintain control of the fraudulently obtained refund checks.

17. The CW stated that after the IRS issues the refund checks, Valdez and Hernandez, or others at their direction, retrieved the checks from the addresses that they utilized for the fraudulent returns. In order to cash the fraudulently-obtained tax refund checks, however, identification is needed. The CW stated that Valdez and Hernandez obtained fake identification cards. The fake identification cards were prepared with names matching the refund checks. The CW explained that the fake identification cards were poorly designed and purport to be from places outside the United States, such as Mexico, Guatemala, or Honduras. The same photograph was typically used on multiple identification cards. According to the CW, however, the quality of the identification cards does not matter because they are used only with the check cashers who are also part of Valdez and Hernandez's conspiracy. Among the documents turned over by the CW were approximately thirty-four (34) identification cards and approximately (15) uncashed Federal tax refund checks, all issued to different payees, with a total face value of approximately $88,546.

18. Once Valdez and Hernandez had the refund checks, they would cash them at one of two Knoxville area check cashing businesses, including Carvajal's business. The CW identified

9

Servicios Latinos, located at 521 Highway 321, Suite 3, Lenoir City, Tennessee, as the check cashing business operated by Carvajal. The CW explained that Carvajal cashed fraudulent checks from Valdez and Hernandez and charged a 14% commission on each check. Carvajal made a copy of the refund check, the ITIN form, and the fake identification card for her records, although none of the identification cards have Valdez or Hernandez's name or picture on them.

19. On December 16, 2014, numerous search warrants were executed in the Knoxville, Tennessee metropolitan area, including at Aurora Carvajal's residence and business (Servicios Latinos). Evidence seized at Servicios Latinos included green hanging file folders with foreign identification documents stapled to the folders. Located inside those folders were copies of U.S. Treasury Checks, federal tax returns, ITIN documents, and identification documents. Many of these folders included handwritten notes that appeared to calculate Aurora Carvajal's fee for cashing U.S. Treasury Checks. Folders were located that had Valdez, Hernandez, and other co-conspirators' foreign identification documents stapled to the folder. These folders represent Aurora Carvajal's filing system for tracking U.S. Treasury Checks she cashed for each co-conspirator. Carvajal labeled the folder by attaching a photocopy of the co-conspirator's foreign identification document and filed copies

10

of each U.S. Treasury check she cashed for that individual in
their respective folders.

20. After the execution of the search warrants in December
2014, Carvajal began cooperating with law enforcement. Carvajal
admitted that she was cashing fraudulently obtained refund
checks and charging a much higher than normal commission.
Carvajal stated that she charged a higher than normal commission
because she knew what she was doing was illegal and the she
believed she was "Putting her neck on the line."

21. Carvajal admitted that she cashed US Treasury checks in
excess of $8 Million, most of which were fraudulently obtained.
Carvajal identified Amado Valdez and Oscar Hernandez, also known
as "The Shark," as two of her larger customers that would cash
fraudulently obtained US refund checks.

22. Carvajal identified Francisco Castro-Reyes (hereafter
"Castro") as one of Hernandez's partners in North Carolina.
Carvajal stated that Hernandez left the country over a year ago
and that Castro began working with Hernandez's brother, Manuel.
Castro and Manuel would come to Servicios Latinos together, or
would bring fraudulently obtained checks for one another.

23. Carvajal recalls meeting Castro in 2012. Carvajal stated
that during the last couple of tax seasons, Castro would cash
checks at Servicios Latinos two or three times a week and would
bring in between ten and twenty refund checks each time.

11

Carvajal identified what purported to be a copy of Castro's Mexican Consular card in a folder seized during the December 2014 warrants. This folder included copies of numerous U.S. Treasury Checks, federal tax returns, ITIN documents, and fake identification documents used by Castro to cash the fraudulently obtained checks.

24. During the week of July 27, 2015, Castro contacted Carvajal on several occasions through telephone calls and text messages to make arrangements for cashing five U.S. Treasury refund checks. Castro asked that Carvajal mail him the necessary documents so that he could complete them and return the documents with the original U.S. Treasury checks to her. Castro provided Carvajal with the address of 120 Manchester Lane, Mocksville, North Carolina 27028, in the Middle District of North Carolina, to mail the documents. Upon receipt of the forms, Castro would complete and return them, along with the U.S. Treasury checks, and would meet with Carvajal to pick up the cash on Saturday, August 8, 2015.

25. On August 5, 2015, your affiant along with other law enforcement agents, including Postal Inspectors with the United States Postal Inspection Service (USPIS), and Carvajal prepared a package to send to Castro. The parcel contained five "packets" of documents Carvajal utilizes to cash U.S. Treasury

12

checks through Viamericas.[1]  Also included in the package was a
return mailer for Castro's use in returning the completed
Viamericas documents and the U.S. Treasury checks.

   26. On August 6, 2015, your affiant along with other law
enforcement, including Inspectors with the USPIS, delivered the
package referenced in the preceding paragraph.  Observed at 120
Manchester Lane, Mocksville, North Carolina during the delivery
was a Ford F-150, maroon in color, bearing North Carolina tag
number CMR5074.  Later that afternoon, Castro notified Carvajal
that he had mailed the package back to Servicios Latinos.

   27. USPIS Inspectors located the package at Steelman's Ace
Hardware in Advance, North Carolina.  The USPS has a kiosk
within the Ace hardware store that can be utilized to send
express mail packages.  Jennifer McKnight works at the USPS
kiosk located within the hardware store.  McKnight stated that
around 3:20 p.m., a Hispanic female came in by herself with a
Tyvek package with a completed USPS label attached. The return
mailer that the female brought for mailing was the same mailer
that was prepared by your affiant and the USPIS Inspectors, as
discussed above.  The female spoke very little English, but told
McKnight she wanted to send the package via overnight delivery.

---

[1] Viamericas is a national money transfer and check cashing
service, which can be used for negotiating large quantities of
checks.  Discovered during the course of this investigation,
federal agents have determined that Carvajal routinely used
Viamericas to cash U.S. Treasury checks.

13

McKnight noticed the label attached to the Tyvek package was an outdated USPS form and told the Hispanic female in the store that she needed to prepare a new label. McKnight completed the form to mail the package to Servicios Latinos at 521 Hwy 321N #3, Lenoir City, TN 37771 for her, but noted that no return address had been provided. At McKnight's request, the Hispanic female provided a return address of 120 Manchester Ln., Mocksville, NC 27028. McKnight placed the new label on a USPS Priority Mail Express package, placed the Tyvek package inside the new envelope and sealed it. McKnight did not open the Tyvek package and did not see its contents. The unknown Hispanic female paid cash prior to departing the store.

28. McKnight did not know the name of the Hispanic female who sent the package; however, she is very familiar with that individual because she is a frequent customer. McKnight stated that the Hispanic female comes to the store two to three times per week to mail multiple packages to the Internal Revenue Service ("IRS"). McKnight stated the Hispanic female mails four to five manila envelopes to the IRS on each occasion.

29. Federal agents retrieved the package and performed a search witih the consent of Carvajal. Contained within the package were five "packets," each consisting of a completed Viamericas form, an original U.S. Treasury refund check, a copy of an identification card, a copy of a tax return, and a copy of

14

an Individual Taxpayer Identification Number form.  Based on the
handwriting, it appears that the forms in each packet were
written and signed by the same individual.  These "packets" are
very similar to the "packets" that your affiant has observed
throughout the Valdez and Hernandez investigation.  Below is the
name and address of each 2014 Form 1040 tax return included
within the package, the original US Treasury check refund check
amount, and how many total returns were filed with the IRS for
each address:

a. Martina Vargas Gomes, 111-60 Herman Sipe Road,
   Conover, NC 28613, U.S. Treasury refund check in the
   amount of $4,355, ten total returns filed in 2014;

b. Manuel Alejandro Vargas, 120 Manchester Lane,
   Mocksville, NC 27028, U.S. Treasury refund check in
   the amount of $5,062, ten total returns filed in 2014;

c.  Brenda Villanueva, 922 Grace St, High Point, NC
   27260, U.S. Treasury refund check in the amount of
   $5,061, ten total returns filed in 2014;

d. Maria Salazar, 922 Grace St, High Point, NC 27260,
   U.S. Treasury refund check in the amount of $5,064,
   ten total returns filed in 2014; and

e. Antonio Beltran-Damian, 1167 Hwy 801, Advance, NC
   27006, U.S. Treasury refund check in the amount of
   $5,034, five total returns in 2014.

15

30. On August 7, 2015, your affiant filed an affidavit in the Eastern District of Tennessee in support of a criminal complaint charging Castro with violating Title 18, United States Code, Section 286 (Conspiracy to Defraud the Government with Respect to Claims). A warrant was issued for Castro's arrest.

31. On August 8, 2015, Castro communicated with Carvajal that he was on his way from North Carolina to Servicios Latinos to retrieve the cash from the US Treasury refund checks he had sent her on August 6' 2015. Castro was pulled over by the Tennessee Highway Patrol (THP) on Hwy. 321 in Lenoir City, Tennessee, approximately a mile from Servicios Latinos. Castro was driving the Ford F150, maroon in color, bearing North Carolina tag number CMR5074 that had been observed at 120 Manchester Lane, Mocksville, North Carolina on August 6, 2015. Castro provided THP with consent to search the vehicle.

32. Found within the vehicle was a Permanent Resident Card in the name of "Castro-Reyes, Francisco J." THP questioned Castro regarding the identification card and Castro admitted that it was fake.

33. Also found within the vehicle were two letters from Woodbridge Investors, Inc. addressed to Francisco Carlos Reyes at 111 Herman Sipe Road, Lot 60, Conover, NC 28613. One of the letters, dated 05/11/2015, was a late rent notice for the same

16

address. There were also two USPS notices addressed to "Beltran" at 111-60 Herman Sipes Road dated June 22nd and 27th.

34. In addition, an IRS Correspondence notifying San Juana Castro Reyes, 111-60 Herman Sipe Road, Conover, NC 28613, was found notifying the recipient of an audit of their 2012 Form 1040. The letter was dated June 29, 2015. Because this type of tax fraud scheme involves the submission to the IRS of spurious refund claims, which are based upon fraudulent documentation, it is not uncommon to find IRS audit notices that have been subsequently sent to to addresses where tax refunds had been mailed.

35. On August 10, 2015, Carvajal stated that after Castro's arrest, she was contacted by Lucero Beltran, Castro's wife. Beltran said that she was at Servicios Latinos in Lenoir City, Tennessee, and wanted to speak to Carvajal regarding what happened to Castro and to collect the cash Carvajal had from cashing the U.S. Treasury refund checks sent to her by Castro.

## SEIZURE OF COMPUTERS AND RELATED EVIDENCE

36. I know that documents and records indicative of illegal activity can be in the form of printed documents, or stored by electronic means (e.g., in computer memory, computer disks, or other computer storage media). In particular, I know, based on my experience and training, that computers are often used in

fraudulent tax return schemes to store documents, help create
fraudulant documents and to communicate via e-mail

37. The following is based upon your affiant's knowledge,
training, and experience, and consultation with Special Agent
John Henry Smith, Computer Investigative Specialist, IRS-CI.
Special Agent Smith has received specialized training regarding
the seizure of computers and related evidence. Special Agent
Smith advised your affiant that computer hardware, computer
software, computer-related documentation, passwords, and data
security devices may be important to a criminal investigation in
three important respects: (1) as instrumentalities for the
violations of federal laws enumerated herein; (2) as devices
used in conjunction with the collection and storage of
electronic data and records related to the alleged violations;
and (3) as fruits of illegal activity. Your affiant expects
that the investigation of the potential criminal offenses
discussed in this affidavit may necessitate the search and
seizure of computer hardware, software, documentation,
passwords, and data security devices, either as
instrumentalities of criminal activity or as storage devices for
evidence thereof.

38. Special Agent Smith advised that in order to completely
and accurately retrieve data maintained in computer hardware or

on computer software, to insure the integrity and completeness

of such data, and to prevent the loss of the data either from

accidental or programmed destruction, it is necessary to seize

the entire operating system, installed programs and data stored

on the computer media.  In conjunction with this search, the

computer specialist will attempt to obtain an "image" of the

computer hard drives.  An image is a "bit by bit" copy of the

hard drive; which allows the seizure of the data without

actually removing the hard drive from the premises.  Specific

permission is requested from the Court, however, to remove such

equipment to an offsite location, such as the computer

specialist's lab, to process and search the computer and related

media, if the computer specialist deems it necessary to do so

(as discussed below). If such a search were necessary, the data

would be processed in a secure off-site environment by a

qualified computer specialist.  An offsite analysis could be

necessitated by the following:

   A.   The volume of evidence.  Computer storage devices (such as

hard disks, diskettes, tapes, laser disks, USB drives "thumb

drives," etc.) can store the equivalent of thousands of pages of

information.  Additionally, a user may seek to conceal criminal

evidence by storing it in random order with deceptive file names.

Searching authorities are thus required to examine all the stored

data to determine which particular files constitute evidence or

19

instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site."

B. Technical requirements. Analyzing computer systems for criminal evidence is a highly technical process requiring specialized skills and a properly controlled environment. Since computer evidence is extremely vulnerable to destruction (both from accidental or inadvertent destruction and from destructive methods employed as "booby traps"), a controlled environment is essential to its complete and accurate analysis.

39. Computer hardware is described as any and all computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. These devices include, but are not limited to, any data-processing hardware (such as central processing units, self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and other memory storage devices); peripheral input/output devices; as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

20

40. Computer software is described as any and all information, including any instructions, programs, or program code, stored in the form of electronic, magnetic, optical, or other media which are capable of being interpreted by a computer or its related components. This software commonly includes operating systems, programs/applications (such as word-processing, graphics, spreadsheet programs, databases programs, accounting and tax preparation software) and utilities.

41. Computer passwords and data security devices or software are described as all those devices, programs, or data, whether themselves in the nature of hardware or software, that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related data.

42. The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files)/ "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word"

21

searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation or in some instances operating a clone of the seized computer to allow access to the installed programs and data.

43. The terms "records, documents, and materials, including those used to facilitate communications" as used above shall also be read to include any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, hard drives, diskettes, tapes, USB (Universal Serial Bus) storage media (Thumb drives), other solid state type storage media or any other media capable of storing information in a form that can be read or interpreted by a computer.

44. All attempts will be made by the computer specialist to obtain images of the computer's hard drive and leave the equipment intact at the search location. To the extent it is necessary – for the reasons set forth above – your affiant requests specific permission from the Court to remove such equipment to an offsite location, such as the computer specialist's lab to process and search the computer and related media.

22

## CONCLUSION

45. Based upon the facts presented in this affidavit and your affiant's training and experience in investigating violations of the Internal Revenue Code and related offenses, I have probable cause to believe that Castro and others are involved in a scheme to defraud the United States in the manner discussed herein. Furthermore, there is probable cause to believe that Castro and others are using and have used the location as described in paragraph number 8 to conduct this scheme. Accordingly, there is probable cause to believe that violations of Title 18, United States Code, Sections 286 (Conspiracy to Defraud the Government with Respect to Claims), 287 (False Fictitious or Fraudulent Claims), 371 (Conspiracy to Commit offense or to Default the United States), 641 (Theft of Public Funds), 1028 (Identity Theft), 1341 (Wire Fraud), 1343 (Mail Fraud), and/or 1956 (Money Laundering) occurred from in or about January 2012 through in or about August 2015, and that evidence of these crimes and the

disposition of fraudulently-obtained proceeds will be found at the locations described herein.

Brian Grove
Special Agent
Internal Revenue Service –
Criminal Investigation

Subscribed and sworn before me
this 12th day of August, 2015.

3:25 P.M.

JOE L. WEBSTER
United States Magistrate Judge

## ATTACHMENT A

111-60 Herman Sipe Road
Conover, North Carolina 28613



The residence located at 111-60 Herman Sipe Road, Conover, North Carolina 28613 is a mobile home constructed of white and brown siding. On the end of the unit are faded white stickers that read "60."

120 Manchester Lane
Mocksville, North Carolina 27028



The residence located at 120 Manchester Lane, Mocksville, North Carolina 27028 is a constructed of tan siding with white trim and a gray shingle roof.

## ATTACHMENT B

### Items to be Seized

Based on the foregoing information, your affiant's training and experience with this and other money laundering investigations and related offenses, there is probable cause to believe that evidence of violations of Title 18 §§ 286 (Conspiracy to Defraud the Government with Respect to Claims), 287 (False Fictitious or Fraudulent Claims), 371 (Conspiracy to Commit offense or to Default the United States), 641 (Theft of Public Funds), 1028 (Identity Theft), 1341 (Wire Fraud) and/or 1343 (Mail Fraud) for the period of January 2012 through August 8, 2015, will be located at the following locations:

    *a.  111 Herman Sipes Road Lot 60, Conover, North Carolina, also known as 111-60 Herman Sipes Road, Conover, North Carolina, and its curtilage and outbuildings, appurtenances, and attached and detached garages and vehicles and trailers located on such curtilage.*

    *b.  120 Manchester Lane, Mocksville, North Carolina, and its curtilage and outbuildings, appurtenances, and attached and detached garages and vehicles and trailers located on such curtilage.*

This evidence includes, but is not limited to:

    a.  Log books, records, payment receipts, notes, and/or customer lists, ledgers, shipping labels and other papers relating to purchasing, shipping, receiving, storage and distribution of personal information and U.S. for foreign identification documents;

    b.  Federal tax forms including, but not limited to Forms W-2, ITIN Forms, federal tax returns and federal refund checks;

    c.  All records of cellular telephone tolls, land line and long distance telephone calls;

    d.  All real estate transactions records, including closing documents, land contracts/leases, mortgage documents, deeds, sales contracts, insurance documents, appraisals, surveys and property tax records;

    e.  United States and/or foreign currency, automobiles, boats, recreational vehicles, other vehicles, home furnishings, safes, stocks, bonds, financial instruments and investments, precious metals and gemstones, jewelry, electronic equipment and other assets which may constitute the proceeds of the sale of the refund scheme;

    f.  All records related to vehicle purchases, auto titles, purchase invoices, service records;

g. All financial statements, accounting records, receipts, and invoices.

h. All federal, state, city tax documents including personal and business income tax returns, copies and drafts thereof, schedules, attachments, tax forms, and tax files;

i. Bank records including: statements, cancelled checks, deposit tickets, passbooks, money drafts, withdrawal slips, certificates of deposit, letters of credit, loan and mortgage records, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, safe deposit box logs, money wrappers, wire transfer applications and/or receipts;

j. Identification documents including driver's license, passports, state identification cards, foreign identification documents and employee identifications;

k. Electronic equipment and their contents, containing information related to the operation of fraudulent schemes and the proceeds there from, including pagers (digital display beepers), telephone answering machines, electronic data organizers, telephone caller identification boxes, video and audiocassette tapes, CD's, DVD's and any stored electronic communications contained therein;

l. Cellular telephone(s) and/or portable cellular telephone(s), PDAs, answering machines and any stored electronic communications contained therein;

m. Photographs of all adults, vehicles, real estate, jewelry, currency, furs, and/or boats, including still photos, negatives, videotapes, CDs, films, slides, undeveloped film and the contents therein;

n. Address and/or telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers;

o. Indicia of occupancy, residency, rental and/or ownership of the premises described above or vehicles located thereon, including utility and telephone bills, cancelled envelopes, keys, deeds, purchase lease agreements, land contracts, titles and vehicle registrations;

p. The opening, search and removal, if necessary, of any safe or locked receptacle or compartment, including briefcases as some or all of the property heretofore may be maintained; and

q. The above described items may be stored on magnetic or electronic media including hard drives, diskettes, Compact Disks (CDs) tapes, USB (Universal Serial Bus) storage media (Thumb drives), other solid state type storage media or any other media capable of storing information in a form to be read by a computer. These records include media maintained as archive or backup copies.

r.  In addition to the data files and records described above, the agents are authorized to seize any software and/or hardware if necessary to access, read and print the information. This includes but is not limited to operating system software, applications software, utility programs, as well as any documentation and manuals that describe the software or hardware and give instructions on its installation and use.

s.  Any software or hardware based licensing schemes that restrict the access or operation of the software without such item. Computer passwords and data security devices including any data security hardware or software (such as devices or software used to encrypt data that is required to access computer programs or data or to otherwise render programs or data into a useable form.

t.  The agents searching for such information are authorized to image, that is, create a bit by bit back-up copy of the computer hard disks and search the image off-site for the files and records described in above. In the event that the agents cannot obtain an image of the hard due to technical, security or other reasons, the agents are authorized to seize the computer(s) and necessary related devices for processing in a secure off-site setting. Any computers seized or related devices will be returned within a reasonable time.

u.  The agents are further authorized to seize floppy disks, compact disks and other "removable media" so that these items can be imaged off-site and returned in as soon as practical.

v.  Cellular telephone(s) and/or portable cellular telephone(s), pagers, PDA's, answering machines and any stored electronic communications contained therein.